**Shari COOPER, Plaintiff,**

v.

**SEDGWICK COUNTY, KANSAS,
et al., Defendants.**

**No. CIV.A.01–1269–MLB.**

United States District Court,
D. Kansas.

June 7, 2002.

Michael K. Lehr, Wichita, KS, for Plaintiff.

Alan L. Rupe, S. Douglas MacKay, Dwight David Fischer, Husch & Eppenberger, LLC, Wichita, KS, for Defendants.

## MEMORANDUM AND ORDER

BELOT, District Judge.

### I. INTRODUCTION

Plaintiff filed this action against Sedgwick County and several of its employees, alleging defendants violated her rights under the United States Constitution, Title VII, and state tort laws. Doc. 2. Defendants moved to dismiss various claims. Doc. 13. On March 29, 2002, the court granted defendants' motion to dismiss with respect to the Title VII claim against the individual defendants. Doc. 30, p. 13. The court also expressed concern about the lack of clarity regarding the claims asserting constitutional and state tort violations against the various defendants. To this end, the court ordered plaintiff to clarify her claims so that it could (1) identify the claims asserted, (2) identify the elements necessary to stating each claim, and (3) determine whether plaintiff had sufficiently pled facts to support the purported claims. Doc. 30, pp. 16, 19.

In plaintiff's response, she set forth, in somewhat more detail, her constitutional claims against Sedgwick County and the

individual defendants. Doc. 35.[1] With plaintiff's positions clarified, a partial ruling upon defendants' original motion to dismiss is possible. Finding jurisdiction proper, 28 U.S.C. § 1331, the court GRANTS in part and DENIES in part defendants' motion subject to further rulings depending on additional clarification of certain of plaintiff's claims as ordered herein.

## A. Motion to Dismiss Standards: Fed. R. Civ. P. 12(b)(6)

The standards this court utilizes upon a motion to dismiss were set forth in the March 29, 2002 Memorandum and Order. Doc. 30, p. 1–2.

The standards this court must utilize upon a motion to dismiss are well known. This court will dismiss a cause of action for a failure to state a claim only when it appears beyond a doubt that the plaintiff can prove no set of facts that would entitle legal relief or when an issue of law is dispositive. *See Ford v. West,* 222 F.3d 767, 771 (10th Cir.2000); *Robinson v. Kansas,* 117 F.Supp.2d 1124, 1129 (D.Kan.2000). All well-pleaded facts and the reasonable inferences derived from those facts are viewed in the light most favorable to plaintiff. *See Ford,* 222 F.3d at 771; *Davis v. United Student Aid Funds, Inc.,* 45 F.Supp.2d 1104, 1106 (D.Kan. 1998). Conclusory allegations, however, have no bearing upon this court's consideration. *See Dunn v. White,* 880 F.2d 1188, 1190 (10th Cir.1989). In the end, the issue is not whether plaintiff will ultimately prevail, but whether she is entitled to offer evidence to support her claims. *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 999,

152 L.Ed.2d 1 (2002); *Robinson,* 117 F.Supp.2d at 1129.

Doc. 30, p. 1–2.

## B. Facts

### 1. Historical Facts

In its March 29, 2002 Memorandum and Order, the court set forth the facts underlying plaintiff's claims in considerable detail. Doc. 30. These facts need not be fully set forth again due to the nature of the inquiry currently before the court. Only those facts pertaining to plaintiff's constitutional claims will be recited, in part, below.

Plaintiff is a female resident of Wichita, Kansas and former employee of the Sedgwick County Sheriff's Department ("the department"). Doc. 2, ¶¶ 4, 14. Plaintiff began her employment with the department as a detention deputy on June 15, 1998. Doc. 2, ¶ 14. By letter dated June 28, 2001, plaintiff was terminated. Doc. 23, Ex. B.

Plaintiff named several defendants in her complaint. Though their activity will be set forth in more detail below, identification of some defendants is necessary at the outset. To begin with, Sedgwick County, Kansas, a political subdivision of the State of Kansas, is the lead defendant. Doc. 2, ¶ 5. Sedgwick County is "vested with the government and management of ["the department"], and the Sedgwick County adult detention facility ["the detention facility"], and the supervision and protection of the employees of" the department. Doc. 2, ¶ 6. In addition to Sedgwick County, plaintiff named Mike Hill and Gary E. Steed, in their individual and official capacities as Sheriff of Sedgwick County.

---

**1.** Plaintiff also "has decided to voluntarily dismiss [the state tort claims] against all defendants ...." Doc. 30, p. 16. As such, the state tort claims are DISMISSED with prejudice.

Doc. 2, ¶¶ 7, 8. Hill was Sheriff at all relevant dates through January 2001, at which time Steed became the Sheriff of Sedgwick County. Doc. 2, ¶¶ 7, 8. The Sedgwick County Sheriff is the commanding officer of all individual defendants. Doc. 2, ¶ 7.

. . . . .

Plaintiff's constitutional and state law claims appear to revolve around her connection to an investigation regarding the unlawful smuggling of cigarettes into the detention facility. As a precursor to the cigarette investigation, however, plaintiff states that Hill, Sedgwick County's Sheriff, observed her taking part in a "peaceful protest" outside of the detention facility in July of 2000.[2] Doc. 2, ¶ 36. Less than a month after the protest, on July 27, 2000, a package of Camel cigarettes was found in the cell of Josh Matchett, an inmate at the detention facility. Doc. 2, ¶ 37. According to the department's policy and procedure, cigarettes are specifically prohibited from being in the possession of inmates within the facility. Doc. 2, ¶ 37. Employees of the detention facility may, however, personally use and possess cigarettes at the detention facility. Doc. 2, ¶¶ 49, 50.

One day prior to the discovery of cigarettes in Matchett's cell, Sergeant Sharon Willits, an employee of the department, forwarded a report to Lieutenant Houston stating that two deputies had approached her and informed her that the word among the inmates was that plaintiff was bringing in cigarettes for inmates in exchange for money. Doc. 2, ¶ 38. The two deputies wanted to remain anonymous but Willits considered them to be reliable sources of information. Doc. 2, ¶ 38. According to the deputies, they had been approached by inmates requesting cigarettes in exchange for money and cited plaintiff as an example of a "cool" deputy who would do such things for money. Doc. 2, ¶ 38. Willits was also informed that at least two inmates made similar allegations about plaintiff's willingness to engage in this illicit activity. Doc. 2, ¶ 38. Based upon the report from the deputies and the inmates, Willits believed that further investigation was required. Doc. 2, ¶ 38. From Willits, the report was sent to Lieutenant White, to Lieutenant Woods, and then finally assigned to the professional standards unit. Doc. 2, ¶ 39.

On July 28, 2000, detective Amy Tracy, an employee of the department, was assigned to investigate how the cigarettes got into Matchett's cell and which, if any, employee of the detention facility was responsible. Doc. 2, ¶ 40. Tracy first interviewed Matchett. During this interview, only a portion of which was audiotaped, Matchett claimed that he received the Camel's from plaintiff and that he had paid plaintiff $20 for the contraband.[3] Doc. 2, ¶ 41. Tracy was also assisted by detectives Greg Pollack and Greg Lathrop.[4] Doc. 2, ¶ 44. In total, Tracy, Pollack, and Lathrop inter-

---

2. The aim of this protest was to call attention to the detention facility employees' conditions of employment, such as low wages and a shortage of employees. Doc. 2, ¶ 36.

3. While an inmate, Matchett was apparently able to obtain a money order from [Quik] Trip. Doc. 2, ¶ 41.

4. In plaintiff's Amended Complaint, she named "Gary Lathrop" and Greg Pollock as defendants. Subsequently, she filed a stipulation and order of dismissal dismissing Pollock from the case and correcting Lathrop's name from "Gary" to "Greg." Docs. 16 and 27. Thus, Greg, not Gary, Lathrop is the defendant in this case.

viewed seventeen inmates and fourteen detention deputies, in addition to plaintiff. Doc. 2, ¶ 45. Plaintiff was identified as the culprit by the inmates only— no detention facility employee ever confirmed plaintiff was responsible for selling or otherwise providing cigarette's to inmates. Doc. 2, ¶ 46.

Not surprisingly, plaintiff has many disagreements with the manner in which the investigation was conducted. For example, plaintiff claims that Tracy and her investigatory team never reviewed plaintiff's work schedule to determine if plaintiff was working at the detention facility on the days in which the cigarettes were found. Doc. 2, ¶ 47. Similarly, plaintiff avers that "numerous names" of detention deputies were mentioned by both inmates and other detention deputies as engaging in the contraband trade but none of them were ever charged with criminal conduct. Doc. 2, ¶ 48.

On August 15, 2000, Tracy wrote an "Affidavit of Probable Cause" in support of filing criminal charges against plaintiff for selling or otherwise providing cigarettes to the inmates at the detention facility. Doc. 2, ¶ 52. At or near this time, criminal charges were filed against plaintiff in Sedgwick County District Court. Doc. 2, ¶ 53. Plaintiff was charged with trafficking in contraband in a correctional institution in violation of KAN. STAT. ANN. § 21–3826. Doc. 2, ¶ 53. Later that same day, plaintiff was arrested by Tracy and booked into the detention facility as an inmate. Doc. 2, ¶ 54 "While being held within the [detention facility,] plaintiff was subjected to a strip search and other humiliating and embarrassing actions by detention facility personnel against

her person." Doc. 2, ¶ 54. Plaintiff was strip searched despite the fact that "[o]ther deputies of [the department] who have been arrested have never been subjected to a strip search while being held within [the detention facility."] Doc. 2, ¶ 55. Following her arrest, plaintiff was suspended without pay by defendant Hill. Doc. 2, ¶ 57. A copy of this letter was sent to defendant Steed and defendant Daniel Bardezbain. Doc. 2, ¶ 57.

Plaintiff's first preliminary hearing occurred on August 30, 2000. Doc. 2, ¶ 57. The first witness was Joshua Matchett, the inmate in whose cell the cigarettes were found. Despite previously telling Tracy that plaintiff provided the cigarettes to him, Matchett denied he had engaged in such a transaction with plaintiff. Doc. 2, ¶ 58. Matchett stated on the record that his earlier statement incriminating plaintiff was the result of Tracy's promise not to place him in "the hole" for possessing contraband.[5] Doc. 2, ¶ 58; Doc. 2, ¶ 42. At the conclusion of Matchett's testimony, Judge Richard Ballinger ordered that attorneys be appointed for Matchett and the other inmates who were to testify on behalf of the state against plaintiff. Doc. 2, ¶ 59. In order to get attorneys for these witnesses, Judge Ballinger rescheduled the preliminary hearing for September 6, 2000 and ordered the State to have all of its witnesses present at that time. Doc. 2, ¶ 59.

On September 6, 2000, at the reconvened preliminary hearing, it was "discovered" that Matchett and the other inmate/witness had been transferred from the detention facility to the Kansas Department of Corrections in Topeka, Kansas. Doc. 2, ¶ 60. Judge Ballinger

---

**5.** To support Matchett's August 30, 2000 version of events, plaintiff makes special note of the fact that Matchett was never sent to the hole for possessing cigarettes. Doc. 2, ¶ 43.

ordered the case dismissed without prejudice. Doc. 2, ¶ 60. "The Sedgwick County District Attorney's Office has announced that it has no intention of *refiling* the criminal charges against plaintiff arising out of the Complaint/Information originally filed by *them*[6] on August 15, 2000." Doc. 2, ¶ 62 (emphasis added).

Doc. 30, p. 2–10.[7]

*2. Clarified Claims*

The court ordered plaintiff to clarify the legal and factual contentions upon which she based her constitutional claims. Specifically, the court stated plaintiff's response

shall (1) identify each specific constitutional violation she suffered, (2) set forth the elements of that violation with proper citation to controlling legal authority, and (3) specifically identify, with respect to each individual, the act(s) or omission(s) that give rise to each specific violation. Plaintiff shall also keep in mind that defendants have collectively asserted that they are or may be clothed with immunity, either qualified and/or absolute. Doc. 15, ¶ 102. With respect to Sedgwick County, plaintiff shall (1) identify each specific constitutional violation she suffered that she claims Sedgwick County is liable under section 1983, (2) separately set forth the specific act(s) that led to this violation and which person(s) committed these acts, and (3) specifically identify, along with citation to controlling legal authority, the basis for alleging that the individual that committed the alleged violation acted as a "policymaker" for Sedgwick County.

Doc. 30, p. 16–17. On April 18, 2002, plaintiff filed a response to this court's order to clarify her allegations. Doc. 35.

a. Individual Defendants

(1) Fourth Amendment

Plaintiff's response identifies five separate "Fourth Amendment claims." Doc. 35, p. 1–2. Plaintiff alleges "[d]efendants" (1) did not have probable cause to arrest her, (2) failed to reasonably inquire and investigate the allegations against her, (3) obtained an arrest warrant by, either knowingly or in reckless disregard of the truth, making materially false statements in the supporting affidavit, (4) maliciously instituting criminal proceedings against plaintiff in retaliation for protected behavior, and (5) unreasonably subjecting her to a strip search. Doc. 35, p. 1–2. Though plaintiff purported to identify five separate claims, she set forth the essential elements of only "lack of probable cause to arrest," a claim she has frequently referred to as a malicious prosecution claim. Doc. 35, p. 2 (Part I.B.1.). The court construes this response to indicate plaintiff's intent to go forward with only her arrest without probable cause claim.[8] Accordingly, all other potential Fourth Amendment claims are DISMISSED.

(2) Fourteenth Amendment

Plaintiff also claims defendants violated her constitutional rights under both the Due Process and Equal Protection Clauses of the Fourteenth Amendment. Doc. 35, p. 10–11. Unlike the Fourth Amendment "claims," plaintiff has attempted to set

---

**6.** The court notes that this statement appears inconsistent with plaintiff's assertion that the named defendants maliciously prosecuted her.

**7.** The preceding five footnotes were originally footnotes two through six in the March 29,

2002 Memorandum and Order. Doc. 30, pp. 6, 7, 9, 10.

**8.** This Fourth Amendment cause of action, for reasons subsequently explained, will be referred to as a "malicious prosecution" claim.

forth the elements of each of these two independent claims.

### b. Sedgwick County

Plaintiff "alleges that Sedgwick County is liable for both the violation of her Fourth Amendment rights and Fourteenth Amendment rights by Sedgwick County based on the holdings of *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) and *City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988)." Doc. 35, p. 13. Plaintiff has failed to specifically identify which person committed which act against her but relies upon her earlier recitation of the facts as constituting her identification of those persons who committed acts on behalf of Sedgwick County. Doc. 35, p. 15. Plaintiff claims former Sheriff Hill was a policymaker for Sedgwick County with respect to the filing of charges due to the authority vested in him by way of Kansas law and departmental regulations. Doc. 35, p. 16. Additionally, Hill, along with Steed and Bardezbain, are alleged to be policymakers with respect to their purported participation in the investigation, arrest, and decision to charge plaintiff. Doc. 35, p. 16.

## II. ANALYSIS

### A. Fourth Amendment

#### 1. Legal Framework

Plaintiff alleges that she was arrested and charged with criminal conduct even though no probable cause to believe she committed a crime existed. Doc. 35, p. 2. When faced with similar allegations, the Tenth Circuit has recognized, and the Supreme Court likely would recognize, that a cause of action against sheriff's officers arises under the Fourth Amendment.[9] *Wolford v. Lasater*, 78 F.3d 484, 489–90 (10th Cir.1996) (analyzing a Fourth Amendment malicious prosecution claim against a sheriff's department and its officials); *Albright v. Oliver*, 510 U.S. 266, 274, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (Rehnquist, C.J., plurality) (rejecting plaintiff's categorization of a malicious prosecution claim under a substantive due process theory and stating that a malicious prosecution claim, if viable, must arise under the Fourth Amendment). Though somewhat anomalous in nature, the courts have referred to this claim as a "malicious prosecution" claim. *See Albright*, 510 U.S. at 279 n. 5, 114 S.Ct. 807 (Ginsburg, J., concurring) (recognizing the "anomalous" nature of a "malicious prosecution" claim against a police officer because the prosecutor, not the police officer, institutes criminal proceedings).

 "The common law elements of malicious prosecution are the 'starting point' for the analysis of a § 1983 malicious prosecution claim, but the plaintiff must ultimately prove that [her] Fourth Amendment right to be free from unreasonable seizures has been violated by the defendant[s'] conduct." *Mason v. Stock*, 955

---

**9.** It appears the basis for construing claims like this under the Fourth Amendment is because, after arrest and while awaiting trial, the criminal defendant is effectively "seized" for constitutional purposes. *See Taylor v. Meacham*, 82 F.3d 1556, 1561 n. 5 (10th Cir.1996) (citing *Albright v. Oliver*, 510 U.S. 266, 278–79, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (Ginsburg, J., concurring)). The court assumes, without deciding, that plaintiff was, at all relevant times, "seized" in this constitu-

tional sense. *See Albright v. Oliver*, 510 U.S. 266, 278–79, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (Ginsburg, J., concurring) (hypothesizing that there is no constitutionally significant distinction between the defendant who is "out on bail" or is physically incarcerated pending trial); *Taylor*, 82 F.3d at 1561 n. 5 (declining to address this hypothesis because Taylor remained in detention and was therefor actually, not just constructively, seized).

F.Supp. 1293, 1306 (D.Kan.1997). Thus, to state a section 1983 malicious prosecution claim, plaintiff must allege (1) that defendants instituted, procured, or continued a criminal proceeding, (2) defendants acted without probable cause, (3) the criminal proceeding terminated in plaintiff's favor, and (4) that plaintiff sustained damages. *See Gaschler v. Scott County*, 963 F.Supp. 971, 979 (D.Kan.1997). Plaintiff has pled the existence of the third and fourth elements. As such, this court will only analyze the first two elements against each defendant.

### 2. Application to Individual Defendants

#### a. Amy Tracy

#### (1) Institution of Criminal Proceedings

Applying the preceding framework to the charges against Tracy, the court concludes that plaintiff has alleged that Tracy instituted criminal proceedings against her. For example, plaintiff alleges that Tracy filed an affidavit of probable cause, Doc. 35, Ex. 1, that lead to the issuance of an arrest warrant, arrested her, and booked her in the detention facility. Doc. 2, ¶¶ 52, 54. These allegations satisfy the first element of plaintiff's claim against Tracy.

#### (2) Probable Cause

Next, plaintiff alleges that Tracy did not have probable cause to arrest her for trafficking in contraband within the detention facility. Doc. 35, p. 4–5; *see also Mason v. Stock*, 955 F.Supp. 1293, 1307 (D.Kan.1997) (stating that lack of probable cause is an essential element of malicious prosecution under Kansas law). Probable cause is said to arise when the facts and circumstances within the officer's knowledge and judgment, based upon reasonably trustworthy information, would lead a prudent person to believe that the arrestee has committed the offense. *See Meinert v. City of Prairie Village*, 87 F.Supp.2d 1175, 1180 (D.Kan.2000). Plaintiff concedes that Tracy interviewed seventeen inmates and fourteen detention deputies, received a statement from one inmate claiming he bought a pack of cigarettes from plaintiff, and may have received other statements from other inmates relative to plaintiff's guilt. Doc. 2, ¶¶ 45, 52.

Notwithstanding these facts, which would arguably establish probable cause, plaintiff contends that Tracy included in the affidavit of probable cause a coerced and false statement from inmate Matchett and knowingly omitted information that, if included, would have vitiated the existence of probable cause. Doc. 35, p. 4–5. Plaintiff contends this omitted information consists of (1) the fact that Tracy relied solely upon inmates for her information, (2) Tracy had not checked to see if plaintiff was working during the time period when the cigarettes were found, (3) the fact that Tracy did not research applicable law, and (4) the fact that the investigation revealed other deputies had also given cigarettes to inmates but none had been charged with a crime. Doc. 35, p. 4–5. When a party challenges a finding of probable cause due to false or omitted information, the Tenth Circuit has held that the probable cause analysis should be made by setting aside the allegedly false and omitted information and determining whether the remaining content of the affidavit would support a finding of probable cause. *See Taylor v. Meacham*, 82 F.3d 1556, 1562 (10th Cir. 1996); *Wolford v. Lasater*, 78 F.3d 484, 489 (10th Cir.1996).

Even if Matchett's statement is not included in the affidavit and the identified information that plaintiff claims has been omitted is considered, probable cause to believe plaintiff committed the aforementioned offense likely still exists. *See Gas-*

*chler v. Scott County,* 963 F.Supp. 971, 979 (D.Kan.1997) (recognizing that probable cause does not require unanimity of opinion and that the issue of probable cause, where the evidence is undisputed, is a question of law). The affidavit recounts the information from Peter Germes, Monte Miller, Jeff Walcher, Jennifer Taylor, Terri Fry, and Lisa Cardona, all inmates of the detention facility who have claimed plaintiff gave them cigarettes while inmates at the detention facility. Doc. 35, Ex. 1, p. 2–3. In addition to these inmates, the affidavit also set forth a conversation Tracy had with Sundie Walcher, inmate Jeff Walcher's wife. Ms. Walcher stated that she witnessed plaintiff providing Mr. Walcher with cigarettes and feared "there was something else going on." Doc. 35, Ex. 1, p. 2. Though plaintiff contends Tracy's failure to investigate whether plaintiff worked during the period of time that Matchett alleges cigarettes were obtained, she fails to affirmatively deny she was not working during this time. Moreover, plaintiff's concerns about Tracy's lack of legal research fails to reveal what such research would have uncovered.[10] Finally, plaintiff notes but fails to explain the significance of her belief that other deputies may also have engaged in unlawful behavior but were not charged with a crime. Plaintiff has failed to cite any legal authority that would vitiate the lawlessness of her conduct simply because another person also engaged in, yet was not charged with, the same conduct.

These inadequacies in plaintiff's probable cause arsenal indicate success at trial is highly unlikely. That, however, is not the test. The only inquiry is whether there is any set of facts that would entitle plaintiff to relief. *See Robinson v. Kansas,* 117 F.Supp.2d 1124, 1129 (D.Kan.

2000). Upon review of the foregoing, this court cannot state that plaintiff could recover under no circumstances. *See Meade v. Grubbs,* 841 F.2d 1512, 1526 (10th Cir. 1988). She has alleged Tracy arrested her without probable cause and, while the facts she has alleged so·far appear to contradict this, discovery may uncover additional facts to support her claim. While her probable cause argument is filament-thin, dismissal at this time is inappropriate. Thus, Tracy's motion to dismiss the Fourth Amendment malicious prosecution claim is DENIED.

 b. Greg Lathrop

█ Unlike with Tracy, plaintiff does not mention any additional facts specifying Detective Greg Lathrop's culpability in her "malicious prosecution.". Her clarified factual statement reads as follows:

> Detective Greg Lathrop committed.the same acts or omission as Detective Amy Tracy since he assisted her throughout the investigation and therefore had an independent duty to not violate [plaintiff's] constitutional rights. His acts in connection with the investigation amount to the instigation, assistance, or by some means direction or encouragement of [plaintiff's] illegal arrest without probable cause.

Doc. 35, p. 5. Plaintiff has not alleged that Lathrop unlawfully coerced Matchett to make a false statement, improperly drafted the affidavit of probable cause, or otherwise undertook any acts that were contrary to plaintiff's constitutional rights. Rather, plaintiff simply alleges Lathrop "assisted" Tracy in an unspecified manner. Such vague and conclusory allegations are, as a matter of law, inadequate to state a claim for malicious prosecution. *Cf. Erik-*

---

**10.** Plaintiff has failed to provide any authority for the proposition that an investigator or

other law enforcement official must perform legal research before obtaining a warrant.

son v. Pawnee County Bd. of County Comm'rs, 263 F.3d 1151, 1154–55 (10th Cir.2001) (finding the plaintiff's conclusory allegations of lack of probable cause were insufficient to survive a motion to dismiss). Moreover, allowing this type of vague claim to survive would be contrary to the clear commands of the law in this circuit that require each state actor to have some degree of culpability with respect to a constitutional violation. · See Tonkovich v. Kansas Bd. of Regents, 159 F.3d 504, 518 (10th Cir.1998) (stating that an individual cannot be held liable under section 1983 "unless he or she subjected a citizen to the deprivation, or caused a citizen to be subjected to the deprivation"); see also Henry v. Board of Leavenworth County Comm'rs, 64 F.Supp.2d 1042, 1051 (D.Kan.1999) (noting plaintiff must allege personal participation). Accordingly, the motion to dismiss the malicious prosecution claim against Lathrop is GRANTED.

c. Daniel Bardezbain, David Steed, and Mike Hill

 Again, unlike Tracy, plaintiff does not allege defendants Bardezbain, Steed, or Hill took any affirmative acts that deprived her of her constitutional rights. They are liable under section 1983, plaintiff claims, because of their supervisory status. Doc. 35, p. 7–10.

Under § 1983, a defendant may not be held liable under a theory of respondeat superior. [See Gagan v. Norton, 35 F.3d 1473, 1476 n. 4 (10th Cir.1994)]. Instead, to establish supervisory liability, a plaintiff must show that "an affirmative link exists between the [constitutional] deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise." [Meade v. Grubbs, 841 F.2d 1512, 1527 (10th Cir. 1988)] (quotation omitted) (alternation in original).

Worrell v. Henry, 219 F.3d 1197, 1214 (10th Cir.2000) cert. denied sub. nom. Turner v. Worrell, 533 ·U.S. 916, 121 S.Ct. 2521, ·150 L.Ed.2d 693 (2001); Keeling v. Schaefer, 181 F.Supp.2d 1206, 1221 (D.Kan.2001) (citing Worrell ). Thus, to state a claim for supervisor liability against either Bardezbain, Steed, and/or Hill, plaintiff must allege (1) the existence of an affirmative link between the "malicious prosecution" claim and (2) these defendants' personal participation, exercise of control or direction, or failure to supervise. See Worrell, 219 F.3d at 1214; Murrell v. School Dist. No. 1, 186 F.3d 1238, 1250 (10th Cir.1999); see also Meade v. Grubbs, 841 F.2d 1512, 1528 (10th Cir. 1988) (stating the defendant sheriff was potentially liable if he either knew or should have known of his deputies' misconduct yet failed to prevent future violations).

Applying this framework to plaintiff's now-clarified claim, the court concludes that these defendants' motion to dismiss must be denied. Plaintiff has alleged that each of these three supervisory defendants participated in the instigation, direction, and/or encouragement of arresting plaintiff without probable cause. Doc. 35, pp. 7, 8, 10. Viewed in the light most favorable plaintiff, these allegations are sufficient to state a claim for section 1983 supervisory liability. Whether proof of such participation materializes is, however, another matter. Accordingly, defendants' motion to dismiss the claims for supervisory liability is DENIED.

*3. Summary*

Based upon a review of plaintiff's allegations, Docs. 2 and 35, the court GRANTS in part an DENIES in part defendants' motion to dismiss plaintiff's Fourth Amendment Claims. As noted earlier, all Fourth Amendment claims except for the

malicious prosecution claim have been deemed abandoned and are therefore DISMISSED. Also, finding plaintiff has failed to state a claim for malicious prosecution against defendant Lathrop, the court has GRANTED defendants' motion with respect to him. Plaintiff has, however, sufficiently alleged she was "maliciously prosecuted" by defendant Tracy and defendants Hill, Steed, and Bardezbain in their capacities as supervisors. As such, these defendants' motion to dismiss is DENIED.

## B. Fourteenth Amendment

### 1. Due Process: Denial of Liberty Interest

■ Plaintiff further alleges defendants' actions deprived her of a protected liberty interest. While the Fourteenth Amendment protects citizens from government deprivations of life, liberty, and property, it does not do so absolutely. It protects against only those deprivations that are undertaken without due process of law. See Farthing v. City of Shawnee, 39 F.3d 1131, 1135 (10th Cir.1994) (citing U.S. CONST. amend. XIV). Thus, to state a Due Process claim, plaintiff must allege (1) that she possessed a protected liberty interest and (2) that she was not afforded the appropriate level of process during the deprivation. See Garcia v. City of Albuquerque, 232 F.3d 760, 769 (10th Cir.2000) (citing Farthing ); see also Stidham v. Peace Officer Standards & Training, 265 F.3d 1144, 1149 (10th Cir.2001) ("Procedural due process is only available to plaintiffs that establish the existence of a recognized ... liberty interest."). Plaintiff claims she has a protected liberty interest in her reputation and further that defendants intentionally harmed her reputation

"by [1] causing her to be arrested and charged with a felony crime as well as [2] causing plaintiff the loss of her employment" with the department. Doc. 35, p. 11.

### a. Legal Framework

In Paul v. Davis, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), the Supreme Court was faced with a claim that Davis's Fourteenth Amendment right to liberty was denied by the City of Louisville's Chief of Police, Paul, who posted an admittedly defamatory flier that identified Davis as a shoplifter. Davis claimed that his "liberty" interest in his good name and reputation had been abridged. See Paul, 424 U.S. at 697–98, 96 S.Ct. 1155 (recognizing that, but for the presence of a state actor, this claim would be a garden variety state law defamation action). To determine whether defamation of a citizen's reputation constituted a protected liberty interest, the Court began by reviewing its pre–1971 cases on this topic. See Paul, 424 U.S. at 702–706, 96 S.Ct. 1155. The Court stated that these decisions recognized a stigmatizing effect could result from government defamation but that none of its decisions had ever recognized that mere defamation was sufficient to invoke the constitutional guarantees of due process unless there was a coexistent loss of government employment. See Paul, 424 U.S. at 706, 96 S.Ct. 1155.

The Paul Court next reviewed Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971). Constantineau, the Court stated, "held that a Wisconsin statute authorizing the practice of 'posting'[11] was unconstitutional because it failed to provide procedural safeguards

---

11. In Constantineau, the practice of posting "consisted of forbidding in writing the sale or delivery of alcoholic beverages to certain persons who were determined to have become

hazards to themselves, to their family, or to the community by reason of their 'excessive drinking.'" Paul, 424 U.S. at 707, 96 S.Ct. 1155.

of notice and an opportunity to be heard, prior to an individual's being 'posted.'" *Paul,* 424 U.S. at 707, 96 S.Ct. 1155. Though conceding there was language that could mean that a government official's defamatory conduct implicated due process concerns, such a reading would be an inconsistent expansion of the cases relied upon by the *Constantineau* Court. *See Paul,* 424 U.S. at 708, 96 S.Ct. 1155. As such, the Court characterized this language in the *Constantineau* decision as merely holding that the defamation injury, when coupled with the alteration of Constantineau's legal right to purchase and consume alcohol, implicated due process concerns. *See Paul,* 424 U.S. at 710, 96 S.Ct. 1155. This reading, the Court stated, was also consistent with the post-*Constantineau* decision of *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), where the court held that a government defamation, to be actionable under the Fourteenth Amendment, had to "occur in the course of the termination of employment." *Paul,* 424 U.S. at 710, 96 S.Ct. 1155. Similarly, the recognition of liberty interest in *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) was consistent with this reading of *Constantineau* because the school's charges of misconduct infringed upon the student's state-granted right to attend public schools. *See Paul,* 424 U.S. at 710, 96 S.Ct. 1155.

This lengthy line of cases, the Court stated, set forth a framework where defamation was actionable under the Due Process Clause if the defamation altered or extinguished a right or status previously recognized by state law. *See Paul,* 424 U.S. at 711, 96 S.Ct. 1155. Applying this framework to Davis's claim, the Court held "the interest in reputation alone which respondent seeks to vindicate in this action in federal court is quite different from the 'liberty' or 'property' recognized in those cases." *Paul,* 424 U.S. at 711–12, 96 S.Ct. 1155 (stating Kentucky law does not guarantee any present enjoyment of reputation).

Tenth Circuit law, not surprisingly, is consistent with *Paul.* The Tenth Circuit recognizes that an individual's reputation is a protected liberty interest but it also requires "plaintiffs to show that their reputation was damaged 'in connection with [an] adverse action taken against them.' … In other words, 'defamation, standing alone, [is] not sufficient to establish a claim for deprivation of a liberty interest.'" *Stidham v. Peace Officer Standards & Training,* 265 F.3d 1144, 1153 (10th Cir. 2001) (quoting *Flanagan v. Munger,* 890 F.2d 1557, 1571 (10th Cir.1989) and *Renaud v. Wyoming Dep't of Family Servs.,* 203 F.3d 723, 726–27 (10th Cir.2000)). Applying *Paul* and its progeny to plaintiff's allegations, this court must ascertain what "other" right or status, if any, plaintiff claims to have been concomitantly abridged.

b. Application

(1) Liberty Interest: Good Name/Employment

First, it is clear that plaintiff has a protected interest in her good name as it relates to her continued employment with Sedgwick County. *See Workman v. Jordan,* 32 F.3d 475, 480 (10th Cir.1994). To survive a motion to dismiss, however, it is not sufficient to simply point to a protected interest. Rather, plaintiff must allege defendants "infringed upon this liberty interest," *Workman,* 32 F.3d at 481 and that this infringement occurred without the appropriate level of process, *see Prager v. LaFaver,* 5 F.Supp.2d 906, 913 (D.Kan. 1998). Thus, to state a claim, plaintiff must assert (1) the defamatory statements impugned her good name, reputation, hon-

or, or integrity; (2) the defamatory statements were false; (3) the defamatory statements occurred in the course of terminating plaintiff and foreclosed other employment opportunities;[12] and (4) the defamatory statements were published. *See Workman v. Jordan,* 32 F.3d 475, 481 (10th Cir.1994); *Prager v. LaFaver,* 5 F.Supp.2d 906, 913 (D.Kan.1998) (applying *Workman* to defendant's motion to dismiss).

 Upon review of plaintiff's allegations, the court finds plaintiff has sufficiently alleged the existence of elements (1), (2), and (4). A statement that plaintiff introduced a prohibited item into the detention facility in exchange for money sufficiently calls into question her good name, reputation, honor, or integrity.[13] *See Palmer v. City of Monticello,* 31 F.3d 1499, 1503 (10th Cir.1994). Moreover, for purposes of this Memorandum and Order, the court assumes the statement was false. *See Ford v. West,* 222 F.3d 767, 771 (10th Cir.2000) (stating the court must assume the veracity of all well-pleaded facts). The court also finds that plaintiff has sufficiently alleged the statement was published. Doc. 35, p. 12; Doc. 2, ¶ 64.

Plaintiff has not, however, alleged that the statement was made during the course of terminating her employment such that it foreclosed or eliminated other employment opportunities. Analyzing the third prong of the *Workman* test, the Tenth Circuit, in *Renaud,* held that a court must consider both the nature and the timing of the defamatory statement "to determine whether it has been made in the course of an employee's termination." *Renaud,* 203 F.3d at 727. For example, roughly contemporaneous statements about the reasons for termination are not the same thing as roughly contemporaneous statements about other matters unrelated to termination. *See id.* (rejecting plaintiff's liberty interest claim because the statement regarding plaintiff's termination was unrelated to the reason or manner of termination).

Applying *Workman* and *Renaud* to the allegations in plaintiff's Amended Complaint, Doc. 2, and her clarified statements, Doc. 35, the court finds that plaintiff has failed to allege that the defamatory statement was made in the course of her termination. Plaintiff alleges that the statement regarding the alleged trafficking of cigarettes in the detention facility was made and then published in the local media by defendants between August 16, 2000 and September 9, 2000. Doc. 2, ¶ 64. Plaintiff does not, however, allege the statement inferred or otherwise implied that plaintiff was being terminated. Rather, it appears that while plaintiff was not able to return to work, it was her physical and/or mental state that prevented her continued employment, not the actions of any defendant. Doc. 2, ¶ 63. Indeed, plaintiff was not terminated until June 28, 2001, over eight months after the allegedly defamatory statements were made. Doc. 2, ¶ 65.

Moreover, the allegedly defamatory statement is not even claimed to have been

---

12. While the *Workman* court's original statement of this prong could have been interpreted as being disjunctive, a subsequent Tenth Circuit panel clarified by holding that the defamatory statement had to be made during the course of terminating the employee and that it foreclosed other employment opportunities. *See Renaud v. Wyoming Dep't of Family Servs.,* 203 F.3d 723, 728 n. 1 (10th Cir.

2000) (reviewing the authority from which *Workman* 's ambiguous language had originated).

13. As noted below, plaintiff has not specifically identified the defamatory statement. As such, this court assumes this is the general nature of the allegedly defamatory statement.

the reason for plaintiff's termination. Plaintiff contends that she was terminated because of the "aforementioned condition." Doc. 2, ¶ 65. This "aforementioned condition" appears to be plaintiff's "severe and disabling stress and anxiety" that prevented her from returning to work. Doc. 2, ¶ 63. This reading of plaintiff's Amended Complaint is supported by a letter attached to plaintiff's response to defendants' motion to dismiss. Doc. 23, Ex. B. In the letter, Detective Steed memorialized the comments plaintiff shared at a June 27, 2001 Employee Status Hearing. Doc. 23, Ex. B. The letter, apparently accurate, Doc. 23, p. 3, indicates that plaintiff's anxiety condition prevented her from ever returning to work as a law enforcement officer because she was totally "unable to perform the essential functions" of her job and that she would rather receive a letter of termination than resign her position. Doc. 23, Ex. B, p. 1–2. Thus, plaintiff was terminated not as a result of the defamatory statements or even for her alleged role in the trafficking of unlawful contraband within the detention facility but as a result of her anxiety condition and her stated preference to be terminated rather than resign.

This substantial subject-matter disconnect is fatal to plaintiff's claim. In *Siegert v. Gilley*, 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991), for example, the Supreme Court rejected a claim similar to plaintiff's. There, Siegert was notified that he was about to be terminated for ineptitude and chose to resign instead. *See Siegert*, 500 U.S. at 228, 111 S.Ct. 1789. Upon obtaining conditional employment at another government hospital, Siegert applied for but was denied credentials due in part to a letter submitted by his former employer. *See id.* Siegert filed suit based upon this letter but the Supreme Court held that he failed to state a constitutional claim because the alleged defama-

tion contained in the letter was not related to nor did it cause his termination. *See id.* at 234, 111 S.Ct. 1789 (noting Siegert resigned and several weeks prior to alleged defamation). As such, though the letter could provide the basis for a state tort defamation action, it did not state a constitutional violation. *See id.*

Subsequent to *Siegert*, the Tenth Circuit had a similar case in which the plaintiff, who resigned from his job as a law enforcement officer, received an unfavorable review from a state licensing agency, was subsequently unable to obtain employment as a result of that review, and then filed suit. *See Stidham v. Peace Officer Standards & Training*, 265 F.3d 1144, 1149 (10th Cir.2001). The Tenth Circuit ruled that the plaintiff could not state a claim for deprivation of his liberty interest because the alleged defamation did not result in his termination. *See Stidham*, 265 F.3d at 1154 (noting plaintiff was not terminated but resigned). Though future employment was likely foreclosed as a result of the allegedly defamatory statements, the Tenth Circuit stated that *Siegert* was principally indistinguishable such that the plaintiff could not state a claim. *See id.*

Like *Siegert* and *Stidham*, the alleged defamatory statement that plaintiff has presumably identified is unrelated in time and content to plaintiff's termination. Though she was, unlike *Siegert* and *Stidham*, "terminated," the termination occurred (at her request) over eight months after the allegedly defamatory statements were made and the reason for the termination was unrelated to the allegations contained in the defamatory statements. Doc. 2, ¶¶ 63, 65. Because plaintiff has not and apparently cannot allege that the defamatory statements occurred in the course of her termination and that such statements foreclosed other employment opportunities, her liberty interest claim re-

lating to continued employment must be dismissed. *See Lighton v. University of Utah*, 209 F.3d 1213, 1223 (10th Cir.2000) (stating all four *Workman* elements must be alleged to state a claim).

### (2) Liberty Interest: Reputation/In Conjunction With Other Constitutional Violation

#### (a) Does A Cause Of Action Exist?

 Plaintiff, in addition to her *Workman* claim, has also alleged her reputation was tarnished "in connection with" the denial of her Fourth Amendment rights. Doc. 35, p. 11. Plaintiff's position, as a matter of law, is questionable, at best. She relies upon a Ninth Circuit case which would make actionable defamation claims that arise "in connection with" other constitutional deprivations.[14] Doc. 35, p. 12 (citing *Herb Hallman Chevrolet, Inc. v. Nash–Holmes*, 169 F.3d 636, 645 (9th Cir. 1999) which in turn cites *Cooper v. Dupnik*, 924 F.2d 1520, 1532 (9th Cir.1991)). Several cases within the Ninth Circuit, apparently beginning with *Stevens v. Rifkin*, 608 F.Supp. 710, 727–728 (N.D.Cal. 1984) (relying solely upon *Marrero v. City of Hialeah*, 625 F.2d 499, 519 (5th Cir. 1980)), have held that an actionable defamation claim under section 1983 may arise where a plaintiff alleges that an injury to her reputation has been inflicted *in connection with* the deprivation of a federally

protected right. *See Cooper v. Dupnik*, 924 F.2d 1520, 1532, 1534–35 (9th Cir. 1991). In other words, contrary to what *Paul* appears to require, *see Paul*, 424 U.S. at 711, 96 S.Ct. 1155, a plaintiff need not allege the state actor's defamatory statement actually *caused* any additional injury. Instead, it is apparently sufficient under the Fifth and Ninth Circuits' cases for a plaintiff to simply allege her reputation was defamed *in connection with* another constitutional violation. For example, the court in *Marrero*, a case strangely similar to the case at bar, held that the plaintiff could recover not only for the damage to her reputation as an element damages for the malicious prosecution claim but also recover, under a due process theory, for the defamation that occurs in connection with the malicious prosecution. *See Marrero*, 625 F.2d 499, 514, 519 (5th Cir.1980); *see also Cooper v. Dupnik*, 924 F.2d 1520, 1534–35 (9th Cir.1991) (stating the existing case law continues to support application of *Marrero*'s statement that the defamation need not cause any additional injury, only that the defamation arise along with another constitutional violation).

The *Cooper* and *Marrero* line of cases apparently has not been addressed by either the Tenth Circuit or any court within this district.[15] At this stage in the pro-

---

**14.** To say that plaintiff relies upon this case is a generous characterization. Instead of citing cases from the Tenth Circuit, this district, or even cases from one of the other Circuits, plaintiff has relied upon a Federal Jury and Practice manual which apparently cites to this Ninth Circuit case.

**15.** While *Stidham* would not require an adoption of this line of cases, there is language that could be interpreted to support this theory. *See Stidham v. Peace Officer Standards & Training*, 265 F.3d 1144, 1153 (10th Cir.2001) (citing *Flanagan v. Munger*, 890 F.2d 1557, 1571 (10th Cir.1989)) (noting a plaintiff must

show that his reputation was damaged in connection with an adverse action taken against him). Of course, this court is bound not by the language of prior opinions but rather by their holdings. *See Alexander v. Sandoval*, 532 U.S. 275, 282, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) (stating "this Court is bound by holdings, not language"); *see also Buckhannon Bd. & Care Home, Inc. v. West Virginia Dep't of Health & Human Resources*, 532 U.S. 598, 621, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001) (Scalia, J., concurring) (declining to follow the Court's prior misleading dicta); *Atwater v. City of Lago Vista*, 532 U.S. 318, 340, 121 S.Ct. 1536, 149 L.Ed.2d

ceedings, especially without having the luxury of the parties' positions clearly identified, the court is hesitant to dismiss. Plaintiff's allegations certainly allege facts that appear necessary to support the elements identified in the aforementioned cases.[16] Nevertheless, the court's concerns about whether the Tenth Circuit would recognize such a rule and, even if it did, whether plaintiff could recover under this theory cannot be understated. For example, the court questions whether permitting recovery for both damage to plaintiff's reputation as an element of damages on the malicious prosecution claim and for the damage resulting from the injury to plaintiff's "liberty interest" arising "in connection with" the malicious prosecution claim is impermissible double recovery. Moreover, while not pressed in defendants' motion to dismiss, the court questions whether plaintiff's liberty interest claim can survive defendants' reserved defense of qualified immunity. Finally, it is not even clear that the statement defendants allegedly published was defamatory. *See, e.g., Marrero,* 625 F.2d at 519 n. 25; *see also Flanagan v. Munger,* 890 F.2d 1557, 1571 (10th Cir.1989) (affirming the entry of summary judgment as to the liberty interest claim because the identified statements were either true or a matter of opinion). Despite these serious reservations, granting defendants' motion to dismiss is improvident. Hopefully the parties' subsequent briefing on this specific and narrow issue will illuminate the intricacies of the *Cooper/Marrero* cause of action and discovery will fill in the generous assumptions this court is required at this stage to make in favor of plaintiff.

**(b) Are Individual Defendants Liable**

Having determined that a cause of action for defamation in "conjunction" with an otherwise actionable constitutional violation may state a claim, the court must next wade into the morass of plaintiff's (hardly) clarified factual allegations to determine which, if any, defendant may have committed the defamation. Unfortunately, plaintiff has failed to allege or even speculate which, if any, of the named defendants committed the purported defamatory act. Though this court gave plaintiff an opportunity to identify the defendants she claims to have defamed her, she has not even offered her opinion as to who it might have been nor has she produced any authority to support her half-hearted attempt to avoid her obligation to allege facts necessary to state a claim. As already mentioned, section 1983 liability requires some personal participation. Plaintiff's failure to identify or even suggest which defendant perpetrated the supposed defamation is inexcusable. Moreover, while the court, to this point, has assumed that a defamatory statement was made, plaintiff's allegations have failed to identify the defamatory statement.[17]

---

549 (2001) (discounting an "isolated sentence"); *Woodward v. City of Worland,* 977 F.2d 1392, 1399 (10th Cir.1992).

**16.** Plaintiff's pleadings focus solely upon identifying a right that has allegedly been deprived by state actors. Technically, she has failed to allege she has been denied this right *without the appropriate level of process.* This minor oversight may be corrected by an amendment. *See Prager v. LaFaver,* 5 F.Supp.2d 906, 913 (D.Kan.1998) (granting leave to amend to permit plaintiff an opportunity to indicate that not only was he denied a liberty interest but that this denial was undertaken without the appropriate level of due process); *see also Garcia v. City of Albuquerque,* 232 F.3d 760, 769 (10th Cir.2000) (stating that a due process claim requires not only an allegation of the denial of a protected interest but also that such deprivation occurred without the appropriate levels of due process).

**17.** For example, if one of the defendants stated that plaintiff had been arrested for trafficking cigarettes in the detention facility, this

These omissions, which are neither trivial nor technical, are probably sufficient to justify dismissal. Nonetheless, the court must adhere to the rule that no case should be dismissed if plaintiff *could* succeed under at least one factual scenario.[18] This admonition is especially appropriate here. Had plaintiff set forth facts in a manner that has been outlined by this Memorandum and Order, her charges would be sufficient to survive defendants' motion. Because plaintiff has not alleged the necessary facts and because such an error may be the result of sloppy pleading rather than lack of a meritorious claim, the court will permit plaintiff one last opportunity to either set forth the necessary facts to state a claim or point to and discuss pertinent legal authority that excuses (1) her failure to identify the actor responsible for the defamation and (2) her failure to disclose the content of the allegedly defamatory statement.

### c. Summary

Plaintiff has set forth two "liberty interest" claims she believes entitle her to recover against defendants. The first, arising under the Tenth Circuit precedent of *Workman,* is dismissed because plaintiff has failed to allege and does not appear able to ever contend that the purported defamatory statement was made in the course of her termination. The second, arising under precedent from the Fifth and Ninth Circuits, does not have the necessary factual support but this court cannot say that defendant could never factually allege such a cause of action. Accordingly, plaintiff is ordered to either move to amend her complaint as set forth by the Federal Rules of Civil Procedure, which includes the attachment of a Second Amended Complaint that corrects these omissions, or justify, as a matter of law, her deficient factual allegations. This must be accomplished by no later than June 17, 2002 or plaintiff's remaining liberty interest claim will be dismissed with prejudice.

### 2. Equal Protection

Plaintiff next contends defendants violated her "[c]onstitutional rights under the equal protection clause of the Fourteenth [A]mendment ..." by (1) intentionally discriminating against her by charging her with a crime when they had evidence that

---

statement was true and therefore not defamatory.

**18.** Recently, Justice Thomas, speaking for a unanimous Court, reaffirmed this absurdly low bar. *See Swierkiewicz v. Sorema,* 534 U.S. 506, 122 S.Ct. 992, 995, 152 L.Ed.2d 1 (2002). When applied to cases involving *pro se* litigants, perhaps this overindulgent rule makes sense. In this case, however, where plaintiff is represented by counsel, this low threshold, whose origin springs from FED. R. CIV. P. 8(a), only complicates this court's obligation to "secure the just, speedy, and inexpensive determination of every action," FED. R. CIV. P. 1. If plaintiff has viable claims, the court expects and professionalism requires that counsel will perform both the appropriate factual and legal research necessary to prepare a complaint that is sufficiently detailed to permit the court and defendants to understand what claims are being made against which defendants. It is not enough to simply "cut and paste" vague allegations against various employees of Sedgwick County. *See, e.g., Jeaneen Watts v. Sedgwick County Board of Comm'rs,* No. 01–1349–MLB, Memorandum and Order dated June 3, 2002 (noting plaintiff's counsel's pleading stated that a section 1985(3) claim was inadvertently cut and pasted into a complaint where there were no facts to support such a claim). This behavior is annoying when perpetrated by "prison lawyers" but is utterly indefensible when undertaken by a lawyer who has taken an oath to perform legal services in a professional manner. In the future, the court directs plaintiff's counsel to read FED. R. CIV. P. 11(b) and (c) before signing and filing all motions in this court.

other detention deputies had committed the same acts but were not charged with a crime and/or (2) intentionally retaliating against plaintiff for her claims of sexual harassment and exercising her First Amendment rights. Doc. 35, p. 11. Plaintiff was ordered to specifically identify her claims, provide the elements necessary to sustain these claims, and to set forth controlling legal authority supporting her position. Doc. 30. Save for the unhelpful reference to passages from a Federal Jury and Practice Manual, a copy of which the court has not been provided, that apparently relies upon a 1998 Ninth Circuit opinion, plaintiff has wholly failed to meet this clear mandate. Doc. 35, p. 12–13. Despite this abysmal performance, the court will reluctantly construe the scattered "buzzwords" in plaintiff's response to indicate her desire to proceed under Fourteenth Amendment Equal Protection theory of selective and/or vindictive enforcement.[19] *See York v. Secretary of Treasury,* 774 F.2d 417, 422 (10th Cir. 1985) (construing the plaintiff's claim as one of selective enforcement).

a. Legal Framework

■ "The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating" on the basis of race, religion, or another arbitrary factor. *Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 48 L.Ed.2d 597(1976); *see also United States v. Armstrong,* 517 U.S. 456, 464, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996) (stating the Equal Protection Clause prevents discrimination on the account of race, religion, or another "arbitrary classification"). The Tenth Circuit has recognized that while law enforcement discre-

tion is broad, a violation of the Equal Protection Clause arises if the enforcement of facially valid laws is done in an uneven manner. *See, e.g., United States v. Manuel,* 992 F.2d 272, 275 (10th Cir.1993); *Zaintz v. City of Albuquerque,* 739 F.Supp. 1462, 1471–72 (D.N.M.1990). Accordingly, to state a claim for selective enforcement, plaintiff must allege that (1) she has been singled out for the enforcement of trafficking in the detention facility laws while others who are similarly situated have not been subjected to such enforcement and (2) the selection has been invidious or in bad faith and based on intentional discrimination stemming from impermissible considerations such as her exercise constitutional or otherwise federally-protected rights. *See York,* 774 F.2d at 422; *Debbie Duz Donuts v. Black,* No. 92–B–209, 1995 WL 584380, at *8 (D.Colo. Oct. 2, 1995); *see also Poole v. County of Otero,* 271 F.3d 955, 958–59 (10th Cir.2001) (citing *United States v. Furman,* 31 F.3d 1034, 1037 (10th Cir.1994)) (setting forth a similar standard in a selective prosecution case).

■ These elements notwithstanding, the courts have recognized that some degree of selectivity is to be expected. Indeed, a citizen's flagrant criminal violations or antipathy towards authority does not create an immunity or defense to a prosecution that is otherwise justifiable. *See Barton v. Malley,* 626 F.2d 151, 155 (10th Cir.1980). As such, more than conclusory allegations are required to state a claim. *See United States v. Manuel,* 992 F.2d 272, 276 (10th Cir.1993); *Dunn v. White,* 880 F.2d 1188, 1190 (10th Cir.1989).

b. Application

Applying the foregoing authorities to plaintiff's allegations, the court finds that

---

**19.** By characterizing plaintiff's claim as a selective "enforcement," as opposed to "prosecution," the court retains the common sense distinction between law enforcement officers and prosecutors. This characterization, however, does not limit consideration of any of the acts that plaintiff alleges any of the defendants to have committed.

plaintiff has generally alleged that she was singled out for prosecution while other, similarly situated detention officers have not been proceeded against for the type of conduct she is alleged to have committed. Her allegations, however, are textbook conclusory claims which do not identify the other detention officers or what the level of proof the defendants had with respect to the unidentified other detention deputies culpability. Were the court to permit plaintiff's "bare bones" claims to survive, the deference extended by courts to law enforcement officers would be compromised. *See United States v. Armstrong,* 517 U.S. 456, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996) (noting that the "similarly situated" requirement was designed in part to effectuate the broad level of deference that is afforded executive officials due to the complicated law enforcement/prosecutorial priorities). On the other hand, the familiar refrain about this court's obligation at the motion to dismiss stage reminds this court that dismissal, no matter how deserving, is not now appropriate.

Similarly, the court finds that plaintiff's allegations with respect to the second element of her claim have been insufficiently been plead. Plaintiff alleges that her arrest was motivated by "defendants'" desire to either punish her for her sexual harassment claim and/or for engaging in the peaceful demonstration. Doc. 2, ¶ 78(b). The court will not overlook what has become plaintiff's pattern of refusing to name which defendant may have engaged in this unlawful behavior. The purpose of a motion to dismiss is to distill those claims that are both factually and legally valid. By failing to "name names," plaintiff is thwarting this purpose. The court will permit plaintiff to either correct these omissions or point to and discuss pertinent legal authority that would excuse her failure to (1) identify these "other" detention deputies and (2) set forth the basis upon which she relies for the proposition that they and her are "similarly situated." No later than June 17, 2002, plaintiff either must make these additional allegations in a motion to file a Second Amended Complaint or set forth her reasons, in a separate pleading, why she believes these allegations are unnecessary. If plaintiff chooses the latter of these two options, she should point to and discuss controlling legal authority that excuses her failure to allege (1) facts that would identify these "other" detention deputies and support the notion that their alleged criminal behavior and Sedgwick County's quantum of proof is similar to that of plaintiff's as well as (2) facts that would identify, in a specific, nonconclusory manner, those person who entertained an improper motive when enforcing the law that plaintiff allegedly violated. Whichever method plaintiff chooses, this is plaintiff's last opportunity to survive defendants' motion to dismiss.

c. Summary

Defendants' motion to dismiss plaintiff's claim that arises under the Equal Protection Clause has been characterized as seeking recovery for selective enforcement of the laws. Though plaintiff has attempted to set forth both elements required for recovery under this theory, the court cannot rule upon defendants' motion because of the significant failure to allege specific facts. Plaintiff is therefore ordered to either seek leave to file another amended complaint which corrects these omissions or justify, as a matter of law, her deficient factual allegations by no later than June 17, 2002. If plaintiff fails to comply, this court will dismiss plaintiff's equal protection claim.

**C. Municipal Liability**

*1. Legal Framework*

Plaintiff has also alleged Sedgwick County is liable for the aforementioned

constitutional violations because it, through its "policymakers," has taken actions that have deprived her of her rights under the Fourth and Fourteenth Amendment. Prior to *Monell v. New York City Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), a municipality could not be held liable under section 1983. *See Monroe v. Pape*, 365 U.S. 167, 187, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). In *Monell*, however, the Supreme Court overturned *Monroe* and held that municipalities, including counties, were "persons" as that term was used by Congress when enacting section 1983. *Monell*, 436 U.S. at 694, 98 S.Ct. 2018. Rejecting a respondeat superior standard of liability, however, the *Monell* Court "concluded that municipalities could be held liable only when an injury was inflicted by a government's 'lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'" *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121–22, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (citing *Monell*, 436 U.S. at 694, 98 S.Ct. 2018); *see also Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) ("We also recognized [in *Monell*] that a municipality may not be held liable under section 1983 solely because it employs a tortfeasor."); *Wulf v. City of Wichita*, 883 F.2d 842, 868 (10th Cir.1989) (finding the city incurred no liability despite its chief of police's unlawful action).

As the Court in *Praprotnik* [20] noted, the dispute in *Monell* involved an official policy requiring city employees to take actions that were unconstitutional. *See Praprotnik*, 485 U.S. at 122, 108 S.Ct. 915. Subsequent to *Monell*, however, the Court has recognized that an unconstitutional governmental policy did not have to be in writing or otherwise "sanctioned" but could, in some circumstances, be inferred from a single decision "taken by the highest officials responsible for setting the policy in that area of the government's business." *See id.* at 123, 108 S.Ct. 915. Based upon plaintiff's pleadings, it is clear she seeks to hold Sedgwick County liable not for any written or formal policy and the *Monell* line of cases but rather for the impromptu decisions of former Sheriff Hill.[21] Doc. 35, p. 16. Specifically, plaintiff claims that Sheriff Hill, as final policymaker for the county, took actions that deprived her of certain constitutional rights. Doc. 35, p. 15–16. As such, determining whether Sedgwick County is a proper defendant in this action turns upon whether he had "final policymaking authority" so as to make his action attributable to the county. *See Randle v. City of Aurora*, 69 F.3d 441, 447 (10th Cir.1995) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)).

Determining whether Sheriff Hill is policymaker is based upon Kansas law. *See McMillian v. Monroe County*, 520 U.S. 781, 786, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997). The inquiry is not, however, whether Sheriff Hill is a policymaker for all purposes but whether, as to the specific

---

**20.** The portions citing *Praprotnik* come from the plurality opinion of Justice O'Connor. The Tenth Circuit has held, however, that her opinion "can fairly be read as binding precedent because it was apparently adopted by a full majority of the Supreme Court in [*Jett v. Dallas Independent School District*, 491 U.S. 701, 737–38, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989)]." *Randle v. City of Aurora*, 69 F.3d 441, 447 (10th Cir.1995).

**21.** For purposes of this Memorandum and Order, the court will refer only to Sheriff Hill, even though Hill's tenure ended and Steed's began during this saga. Nomenclature, at this point, is largely irrelevant because the only issue is whether the elected Sheriff of Sedgwick County has take actions that would subject the county to liability.

action plaintiff alleges Sheriff Hill has taken against plaintiff, Sheriff Hill can fairly be said to have been making a policy decision on behalf of the county. *See id.*

### 2. Application

■ Applying this framework to plaintiff's allegations, the court finds that Sedgwick County's motion to dismiss must be denied in light of the extremely light burden that is imposed upon plaintiff. Plaintiff has alleged that Sheriff Hill (1) knew or acquiesced in the denial of her Fourth Amendment rights and (2) knew or acquiesced in the denial of her rights under the and Due Process Clause of the Fourteenth Amendment. Doc. 35, p. 7–10 Moreover, plaintiff has alleged that Sheriff Hill is a policymaker for Sedgwick County as it relates to the decision to investigate and eventually file charges against a detention officer. Doc. 35, p. 16. Finally, plaintiff's allegations, if true, are such that causation, i.e., that Sedgwick County's actions caused the deprivation, is not an issue. *See Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 404–05, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). Though her response is barely sufficient to withstand Sedgwick County's motion to dismiss, plaintiff is admonished that a similarly haphazard performance in the preparation of a pretrial order and during the inevitable summary judgment stage will not receive the same lenient treatment.

### III. CONCLUSION

For the following reasons, defendants' motion to dismiss is GRANTED in part, DENIED in part, and judgment is reserved in part. With respect to plaintiff's Fourth Amendment claims, (1) any cause of action other than for malicious prosecution is DISMISSED and (2) defendant Lathrop's motion to dismiss the malicious prosecution claim against him is GRANTED but (3) defendants Tracy, Hill, Steed, and Bardezbain's motion to dismiss plaintiff's claim for malicious prosecution is DENIED. Again, insofar as plaintiff presses a claim under the Due Process Clause, defendants' motion to dismiss (1) plaintiff's claim for deprivation of her good name as it relates to continued employment is GRANTED, but (2) judgment is reserved as to (a) plaintiff's claim that she was deprived of her good name in conjunction with the denial of her rights under the Fourth Amendment and (b) plaintiff's claim that defendants' decision to prosecute her for trafficking in contraband within a detention facility in violation of the Equal Protection Clause until plaintiff specify's which defendant is or may be responsible. Plaintiff shall move to amend and attach a proposed Second Amended Complaint or otherwise justify her failures by no later than June 17, 2002 or these unclarified matters will be dismissed with prejudice. Finally, defendant Sedgwick County's motion to dismiss plaintiff's claims that it is liable for the aforementioned violations is DENIED insofar as plaintiff has stated a valid constitutional claim.

A motion for reconsideration of this order is neither expected nor encouraged. Any such motion shall not exceed 3 double-spaced pages and shall strictly comply with the standards enunciated by this court in *Comeau v. Rupp*, 810 F.Supp. 1172, 1174 (1992). The response to any motion for reconsideration shall not exceed 3 double-spaced pages. No reply shall be filed. Failure to adhere to these limitations will operate as a waiver to reconsideration.

IT IS SO ORDERED.